My name is MJ Hayden. I'm an assistant federal defender for the District of Alaska. I'm here representing Mr. Goss, who is the felon in this case. There are two issues. The first issue is a suppression issue dealing with whether a valid traffic stop was prolonged without reasonable suspicion. The second issue is an issue regarding whether the court erred in allowing Mr. Goss's prior conviction to be suspended. I would like to spend the majority of my time addressing the suppression issue as it is dispositive of the case, but I will obviously answer any questions that the court has regarding the 404B issue. Mr. Goss was stopped on April 15, 2006 for running the red light. There's no dispute that the court had not only reasonable suspicion but probable cause to stop him for running that red light. Upon approaching the car, the officer asked Mr. Goss for his driver's license and registration. Mr. Goss produced a driver's license and a rental car agreement. The officer instructed him to pull into a nearby parking lot. Mr. Goss did that, and the officer did his regular procedure regarding a traffic stop. He called in Mr. Goss's driver's license, which was valid. There were no warrants out for Mr. Goss. He called in the tag of the rental car, which gave him the information for the rental car. He then called in to see if he had any drug history. This is called the 35 factors as described in my brief. The dispatch said yes, he has some type of drug history, but with nothing more. Nothing to describe whether this was a contact, a conviction, how old it was, what type of drug was involved, whether he was a complainant, defendant, nothing more than he appeared in the computer. Upon hearing that, the officer called for backup. The officer testified at the suppression hearing that this was not a standard procedure to call for backup for the simple issuance of a citation and running a red light. Well, you've recited a lot of things, but not all of the things that the officer knew at the time he decided to prolong the stop. The seven air fresheners, the fact that somebody else's name was on the rental agreement, the radar detector, and taken together, why aren't all of the factors that the officer was aware of sufficient to allow the prolonging of the stop, including the drug history, of course, as well? Yes, Your Honor. The first issue is with the air fresheners. The officer testified at the suppression hearing that the air fresheners were not giving off any odor. And I cited several cases, none of which are in this district, that suggest that the presence of air fresheners in and of itself is not a basis for probable cause. Here's my problem. First of all, he doesn't have to get to the level of probable cause, but only reasonable suspicion. But the Supreme Court has pretty well smacked us down for trying to divide and conquer and saying, well, this particular factor could be innocent, and this particular factor, standing alone, isn't enough. And in Arvizu, the court said, you've got to put it all together in a package. And so, can you do that for us, put it all together in a package and tell us why it doesn't even rise to the level of reasonable suspicion? Finally, as you're tying up the package, there was also at some point an inquiry from the officer to the appellant, I think, where the appellant indicated that he had a prior weapons offense. And I wanted to know if that question-answer occurred before the decision was made to extend the duration. Let me address both questions. First of all, your question, Your Honor. The statement regarding the prior for the weapon, it is our position that the traffic stop was prolonged once the officer requested backup, because that was an unusual procedure for such a simple traffic stop. At that time, the officer did not know about Mr. Goss' statement regarding his prior contact with law enforcement regarding the weapon. That was long into the conversation. And as the magistrate court held that the traffic stop was prolonged at the time that the officer asked for consent to search the vehicle, the district court accepted the factual findings of the magistrate, although the district court reversed the magistrate, saying that there was reasonable suspicion. But the district court did not make a finding as to when the traffic stop became prolonged. You're saying the weapons statement is not in the package of... I would say that the weapons... to be considered on reasonable suspicion. Correct, Your Honor. I would say that the weapons statement is not in the package. What the officer knew at the time that the traffic stop was prolonged was that there were air fresheners in the car. He did not know how many. That the air fresheners were not giving off an odor. That Mr. Goss had 3,500 history. That there was a radar detector in the car, although there's no indication that the radar detector was on or was even operable at the time. And that... He knew it was a rental car, right? Rented to someone else. There's some dispute as to the facts in that issue because of the questions that he asked Mr. Goss. If you read the transcript, all of this was on videotape and there is an audio tape and a videotape. And the questions that he poses to Mr. Goss seems to indicate that he did not know that the rental car was rented in someone else's name. He didn't know it was a rental car. Although he doesn't really explain why the fact that it's a rental car led him to believe that drug trafficking was occurring. But he did know that it was a rental car based on the information that he got. Well, potentially there's greater deniability. It must have been the person who rented it before me that put that stuff in the trunk or inside the door panel. I think from my own car, it's a little harder to argue that. That was the theory at trial, but in assessing whether there was reasonable suspicion or not, just the fact that it was a rental car. And he placed, I guess, great significance on the fact that it was a rental car rented in Fairbanks when Mr. Goss his driver's license indicated that he was a resident of Fairbanks. So I think when you put those facts together, what the officer knew at the time that he got out of the car, where the magistrate suggested that the traffic stop was complete, that those issues, those factors do not add up to reasonable suspicion. What about the route? As I recall, the officer gave some weight to the red light being on a highway that is the route from Anchorage to Fairbanks.  sometimes run from Anchorage to Fairbanks. But I mean, how many highways go from Anchorage to Fairbanks? If any. I've been in both cities, but I can't imagine a multiplicity of highways from the two cities, and that one is the known smuggler route. There is one highway that runs from Anchorage to Fairbanks, and that is the Parks Highway. Mr. Goss was not on the Parks The district court took judicial notice that he was on a roadway that one would take if one were coming into Fairbanks from Anchorage. But there was no indication in the record that the officer thought that there was any reason to believe that he had traveled from Anchorage to Fairbanks, based on the location of the stop. If the court has no further questions, I'd like to reserve them. We asked you a lot of questions. We'll give you a minute for rebuttal when the time comes. We'll give you rebuttal time because we used up a lot of your time. Thank you. In the police court, my name is Brian Schroeder. At the time when the officer made the decision to extend the duration of the stop to call for a dog, what are the factors that go to reasonable suspicion at that time? Your Honor, at the time he made the call, the factors, if you'll just let me, I have to keep a list to make sure that I get things consistently here, and I'll try to run through those quickly. Judge Beislein identified ten factors. I think the key ones, and Ms. Hayden talked a bit about the road. There was that factor of Geist Road in Fairbanks being a way you would come into the city from the main road from Anchorage, although there's a second road. It's just an awfully long way around to get there. So the Parks Highway is the main road. And Judge Beislein made a judicial finding that it was Geist Road connected to that. The officer also testifies that because of his training, he is aware that that road is used to move drugs back and forth. And he's an 11-year veteran officer, I guess ten years at the time. But I think the key point that we would make is what you see as a line of conduct here, that's avoidance behavior. This is somebody trying to avoid getting caught, and if he can't avoid getting caught, he's trying to avoid making sure he doesn't get tagged with what happens in that car. So I think the key factors, and the biggest red flag was the officer walks up to the car, first thing, and he sees these air fresheners. Now, he didn't count them at the time, but he testifies multiple air fresheners, and multiple air fresheners hanging from above the passenger side door and above the driver's side door. And the government would submit, there's really only one reason you're going to put air fresheners there, and that's to prevent somebody standing outside your window from and the most likely person to be standing outside of your window is a police officer. So that's the biggest red flag, and the officer testifies he's never seen that many air fresheners before. He's never seen him positioned like that before. Second, he sees a radar detector, as the court's always mentioned. Now, a radar detector's certainly legal, but we're not talking about a stop on the interstate highway system. We're talking about a car in town just driving around Fairbanks, so it's a little more unusual. And we're also talking about a rental car, so it's something not installed in somebody's regular car that they drive around, but temporarily installed in a car that they're driving in town in Fairbanks. Again, nothing illegal about that, but unusual. The fact that it's a rental car with a local driver. Again, nothing illegal about renting a car in your hometown, but Officer Keeler testifies what he's used to seeing is business people or tourists driving rental cars. It's unusual to see a local, so that's unusual. But I think the really unusual thing about the rental agreement was that he sees this is not the person who rented the car, and he's not even an authorized driver. Counsel indicates that there's some question about that. The government would argue there's no question about that. If you go to the excerpt of record, pages 73 and 74, or 592, you would see that Officer Keeler clearly testified at the suppression hearing and at trial that he was aware, he looked at the rental car agreement, and he was aware of those things. The fact that he may not have fronted that out to the defendant when he talked to him just means that he was playing his cards close to his chest. He knew that at the time. Did he testify anything about the Dollar Avis discrepancy? He did testify that the office, that he asked the question and got the wrong answer. I don't know if I can point you to any place in the record, Your Honor, where he analyzes that. But interestingly, if you look at the record of the actual stop, the officer says, where did you rent this? Because the defendant said he worked at a car dealership. And he said, was that where you rented it? He said, no, I rented it from Dollar. And you can see in the transcript the double take where he goes, Dollar? I mean, so I think the officer was. He picked that up. You can see it from the transcript that he picked that up. And just to conclude or add those couple more points, Your Honor. What's the significance in terms of suspicion of the driver not knowing what is the correct rental agency? Correct rental agency was Avis. And I. What's the relevance for suspicion of him not knowing that? I think there's a couple issues. Your Honor, one may be that he just didn't know. And just as kind of common practice, a normal person borrowing a car ought to know, hey, if I have to call in an accident or whatever, I'm going to know where it's rented from. But I think the government would submit that this is, again, well, it might be part of that deceptive behavior. He might not have realized that the officer knew where it was from. And he was trying to be more concealing. Now, I wouldn't argue that that's the list of factors for reasonable suspicion, that that's the highest one on the list. But I think it just adds into the officer seeing that he thinks this guy is trying to be deceptive. Is the time that we should be looking at the point at which he called to get a backup officer? Or was there a different time when he called to get the dog to do a sniff? No, Your Honor. I mean, I don't think there was no case cited, and I know of no precedent that says that when an officer is going through a normal traffic stop, if they pick up the dog and they're doing their paperwork and whatever, that that automatically ends the traffic stop and prolongs it. I don't think that's the case, and I've seen no precedent. What difference would it make to your position if that were the point that we looked at? Did the officer know this list of things that you've given us at that time as well? You know, Your Honor, I'd have to go back and look carefully and probably listen to the tape to tell you exactly what he knew. He certainly knew about the radar detector, certainly knew about the air fresheners. I think it's likely he knew about the rental car. He certainly knew the location of the road, because he was he knew the location of the road. Yes, Your Honor. He knew all of that. So I think we would make the argument that he had reasonable suspicion at that point. But I think our point for the we I think where the traffic stop ended and the prolonging occurred was at the point where he finished his normal process of what he would do for the traffic ticket, which was when he asked the defendant a couple of questions about where he worked and what the phone number was, because that's on the traffic ticket where he has to fill that in. I think once he got that, the traffic stop was adjourned. Where did he get the info, information that there was 3,500 or drug-related information on this person? Through his dispatch. He calls in. You can hear it on the tape. He calls into his dispatch, says, is there any 3,500 history? And the dispatch comes back and says affirmative. Is that that's before he calls for backup? I don't know the answer to that question, Your Honor. I'd have to go back and listen to the tape. And just I would add the last couple of points to finish out your question. The last couple I think of big factors was the officer asked him the question, and it's on the tape. He asked him the question, where do you work? And then he asked what the number is. The person comes back, the defendant comes back and says, don't know the number. That struck the officers quite unusual, because just most people know the number of the place that they work, either to tell people where to call them or to call in and report if they're sick or whatever. It's just very unusual for that. He's starting to think about, well, what does that mean? Does this guy really have a job? And then he notices he's wearing what appears to be an expensive-looking watch, and he thinks, you know, that doesn't add up either. And all of those factors, it's the government's position that all of those factors, and I think consistently with that idea of avoidance behavior, trying to avoid getting caught and then avoiding responsibility for the guard if he gets caught, all that added up in Officer Keillor's mind to reasonable suspicion. And I guess my last point, I would just make, Your Honor, I went back and reread Terry again, and I think at the end, with all of this that Officer Keillor had in front of him, Terry makes the comment it would be poor police work indeed for an officer not to do something about that and follow up. Officer Keillor did that, and I think he did it in the most diligent way possible, and the government would request that the Court affirm the conviction. The question really has nothing to do with the resolution of the case, but I'm curious. Was he he was videotaping this all the time he's talking to the... It was a videotape in the car. It was videotaping the patrol... He turns that on in the patrol car and then gets out. And it's also the officer wears a, he wears a body mic that feeds into that system, so you actually get the recorded conversation as well as the video. Very interesting. Thank you. Ms. Hayden, we'll restore a minute for rebuttal for you. Yes, Your Honor. Just a few comments. Regarding the air fresheners, there was no testimony as to how long this car had been rented. The officer testified that the air fresheners were not giving off any odor, as well as there were two puppies in the car. So we would submit that the air fresheners could be in there for a number of purposes. People get charged extra fines if they smoke cigarettes in a rental car. And certainly having puppies in the rental car could cause the rental car to have odor. And not knowing how long that the rental car had been rented, the fact that it had numerous air fresheners is less significant. The radar detector, there was no testimony that the radar detector was in any way associated with drug trafficking and the officer's suspicion of drug trafficking. Simply that people have radar detectors to avoid getting pulled over by police officers. The questions that the officer asked, and you can see that in the transcript, regarding where the rental car had been rented from and who rented it, simply don't jive with the fact that he knew that it was rented by another individual at the time he began to question Mr. Goss. Well, what's wrong with that? Well, I think that there's no duty of the officer to disclose everything he knows when he's questioning, is there? If you listen to his inflection and his tone on the tape, I don't think it's because he was trying to mislead Mr. Goss or not show his hand to Mr. Goss. I think it was because he genuinely did not know where the rental car was rented from nor who rented it. Again, you would have to listen to the actual tape. But all of that conversation comes after he has called for backup and after he has taken steps that are inconsistent with a simple traffic stop. It's before the citation is fully prepared, right? There is testimony that after he received the 3553 information that he remained in his vehicle and not only was he completing the citation, which, by the way, was never presented, but he was completing the citation and he was sitting there making observation of Mr. Goss, which was not the standard procedure for him writing a traffic citation. So he was, at that point, after he called for backup, prolonging the traffic stop and waiting for backup before he got out of his car. The magistrate who made the factual findings in this case found that at the time that the officer got out of his car, there was sufficient time to complete the traffic citation. So it's our position that at the time he got out of his car, before he asked Mr. Goss anything regarding his home phone number or his work phone number or that he noticed the watch on his arm or that he asked any questions regarding the source of the rental car, that at that time, the traffic stop was prolonged. Thank you, counsel. You've exceeded your time and we appreciate the arguments of both counsel and the case just argued is submitted. We will take about a 10-minute break.
judges: Canby, Graber, Gould